**UNITED STATES of America,**

**v.**

**Jose MORALES, Defendant.**

**No. 85 CR 182 (WK).**

United States District Court,
S.D. New York

June 19, 1985.

As Modified June 21, 1985.

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., by Vincent L. Briccetti, Asst. U.S. Atty., New York City, for plaintiff.

Gerald J. McMahon, New York City, for defendant.

## MEMORANDUM & ORDER

WHITMAN KNAPP, District Judge.

Defendant moves to suppress certain statements made by him as well as physical evidence obtained from his person in the course of his arrest for violations of the narcotics laws. He asserts that his rights under *Miranda v. Arizona* (1966) 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, were violated and that his arrest was unlawful.

The facts which emerged at the hearing held on this motion and from defendant's affidavit made in support thereof are as follows. At about 5:00 p.m. on February 6, 1985, a team of five narcotics law enforcement police officers executed a search warrant at a building on the lower east side of Manhattan. They were admitted into the apartment after they requested entry, were refused, and then attempted a forced entry. Transcript of May 9, 1984 Hearing ("Tr.") at 11, 14. They found three persons inside: the elderly tenant, Maria Hernandez, her infant niece, and defendant Jose Morales. The first person they observed was Hernandez. Tr. 11. The officers then noticed defendant, who was standing in or near a doorway between the living room and a back bedroom. Tr. 11, 58. They directed defendant to sit on a couch in the living room. Tr. 11, 24. After frisking defendant and ascertaining that no other persons were present, the officers holstered their guns. Sergeant Katowitz, the leader of the team, advised Maria Hernandez of her *Miranda* rights[1] in the kitchen of the apartment, Tr. 26, while defendant remained under guard in the adjacent living room. Sergeant Katowitz did not know whether defendant heard what was said to Hernandez, Tr. 26, and he was not at this time separately advised of his *Miranda* rights. Defendant and Hernandez were

---

1. The Sergeant advised her that "she had a right to remain silent, anything she said could be used against her in a court of law. I advised her she has a right to have an attorney present during any questioning. If an attorney could not be afforded, one would be provided free of cost; that if she decided to talk, she could stop at any time and request an attorney presence [sic]." Tr. 12–13.

not told they were under arrest, Tr. 13, 42, and neither was handcuffed, Tr. 14, 59, but neither was free to leave the premises, Tr. 14, 28–29.

The officers commenced their search of the apartment. During this time defendant remained in the living room under the guard of another officer. Tr. 25–26. Hernandez, whom Sergeant Katowitz described as a person who "appeared to be no threat to anyone," Tr. 11, may have been directed to go from the kitchen to the living room because "it was a little more comfortable, she was an elderly woman," with a small child. Tr. 39. After approximately 45 minutes, Officer Cannon found three glassine envelopes containing white powder on the floor of the back bedroom, Tr. 16, 44, which bore the appellation "AIDS." Tr. 44. He picked them up and gave them to Officer Solberg, Tr. 46, who went to the living room, held up the envelopes and asked, "Whose are these?," Tr. 61, or "Who do these belong to?" Tr. 16, 28. Officer Solberg stated that he was not talking to anyone in particular, although Officer Cannon remembered that Solberg had approached and addressed the defendant. Tr. 46. Defendant responded that the glassines were his, Tr. 46, and that they were for his own use. Tr. 66. He was thereupon placed under arrest, handcuffed, and read his *Miranda* rights by Sergeant Katowitz.[2] Defendant stated that he understood these rights, Tr. 31, though Sergeant Katowitz could not remember whether he said he wished to talk. *Ibid.*

The search proceeded for about another 30 minutes. Tr. 27. No other narcotics were found. Tr. 61. The officers then informed defendant that he would be strip searched and asked if he wanted to tell them whether he had anything on his person. Tr. 36, 62. Defendant informed them that he had seven more glassine envelopes in the waistband of his pants. He was then asked, "you have seven in your waistband,

why was there three in the bedroom? If you were looking to dump, why didn't you dump all of them?" Tr. 36. Defendant responded that he had had a hard time getting them out, that he had heard the police coming through the door, that he was afraid and that he was in a rush trying to remove them. Tr. 36–37. The defendant then showed the officers where the seven glassines were secreted in his pants, Tr. 37, 62, and Officer Cannon reached inside and removed them. Tr. 62. These envelopes were marked in the same way as the three glassines found in the bedroom. Tr. 48.

Defendant was interviewed later that night by Assistant United States Attorney Franklin Stone, who again advised him of his *Miranda* rights. He asked to see a lawyer and no statement was taken. The charges against Maria Hernandez, who was also arrested, were later dropped.

By letter dated June 14, 1985, the Government informed defendant's attorney that it would seek to introduce at trial a further statement made by defendant after his arrest. From this letter it appears that on the day of his arrest defendant had been taken to the 7th Precinct where he asked an officer, Bill Bradley, to tell him about the federal system. The officer asked defendant what he wanted to know about it, and defendant "stated, in substance, that he had been caught with ten bags and had no choice but to plead guilty." This statement was not before us at the hearing and was not explored.

## DISCUSSION

### The Detention

 We first find that defendant was permissibly detained pursuant to the police officers' execution of a valid search warrant under the rationale of *Michigan v. Summers* (1981) 452 U.S. 692, 101 S.Ct.

---

**2.** Sergeant Katowitz testified that he "told him he had a right to remain silent, anything he said could be used against him in a court of law. I advised him he had a right to have an attorney present during any questioning. I advised him that if an attorney—he could not afford an attorney, one would be provided free of cost. I advised him that if he decided to talk, any time he wanted to stop and have an attorney present he would be allowed to do so." Tr. 35.

2587, 69 L.Ed.2d 340, and that this detention did not itself rise to the level of an arrest. The Court in *Summers*, 452 U.S. at 705, 101 S.Ct. at 2595, held that

> for Fourth Amendment purposes, ... a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted.

The Court's holding was framed in terms of "occupants," not solely "owners," and defendant fell within its scope by his presence in the searched apartment. *See United States v. Taylor* (4th Cir.1983) 716 F.2d 701, 707. Furthermore, defendant's detention satisfied two of the three justifications given for the *Summers* rule by "preventing flight in the event that incriminating evidence [was] found," 452 U.S. at 702, 101 S.Ct. at 2594, and insuring the safety of the police. *Ibid.* The fact that defendant, not the tenant of the apartment, was unable to facilitate "the orderly completion of the search," the third rationale presented by *Summers, id.* at 703, 101 S.Ct. at 2594, does not undermine the otherwise valid interest in detaining him.

 Further, we do not find the circumstances of the detention to have suggested an arrest. The officers' display of drawn guns in the apartment was permissible even in the absence of probable cause to arrest, *United States v. Harley* (2d Cir. 1982) 682 F.2d 398, 401, and defendants' detention for approximately 45 minutes prior to discovery of the heroin glassines was within the scope of a permissible detention. *See United States v. Timpani* (1st Cir. 1981) 665 F.2d 1 (45 minutes); *Summers, supra* (detention of sufficient length to discover drugs underneath bar in basement of house).

**Pre-Arrest Statements**

 As defendant was not informed of his *Miranda* rights until after he admitted ownership of the three glassines of heroin and was arrested, his pre-arrest statements must be suppressed if they were the result of custodial interrogation. *Miranda v. Ar-izona* (1966) 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. Defendant was detained for almost an hour in an apartment that was not his home. He was directed by an officer with a drawn gun to sit on a couch in the living room where another of the five police officers kept watch over him. We believe this clearly constituted such a deprivation of his freedom of action as to render him "in custody." *Miranda, supra,* 384 U.S. at 444, 86 S.Ct. at 1612; *see Orozco v. Texas* (1969) 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (custodial interrogation in defendant's bedroom).

The Government's citation of *Michigan v. Summers, supra,* is inapposite. While the holding in *Summers* justified defendant's detention as an occupant of the premises for which a valid search warrant was being executed, the Court's opinion nowhere suggests that the mere fact a "detention" may have been permissible for Fourth Amendment purposes made it any less "custodial" for *Miranda* purposes.

Nor are we persuaded by the Government's citation of *Berkemer v. McCarty* (1984) —— U.S. ——, 104 S.Ct. 3138, 82 L.Ed.2d 317, where the Court held that a roadside traffic stop was not "custodial" for purposes of *Miranda*. The deprivation of defendant's liberty here was certainly far greater than that of a subject of a roadside stop which lasts "only a few minutes," *id.* at 3149, and which is made in public with only one or two police officers present. *Id.* at 3150.

Having found that defendant was in custody, we further find that he was subjected to "interrogation" prior to being given the *Miranda* warnings. Even assuming that both he and Maria Hernandez were in the living room when Officer Solberg asked, "Whose are these?" and that the question was directed at both rather than at defendant alone, this gathering of suspects was sufficiently small that defendant might have felt he was being questioned individually. Furthermore, while defendant was told to stay in the living room under police guard, Maria Hernandez, who "appeared to be no threat to anybody," Tr. 11, and

whose movements none of the officers could recall with the same detail as those of defendant, was apparently more free to roam. In this situation, we believe it plausible that defendant felt it was he who was being questioned and find that Sergeant Solberg's question was one which "the police should [have known was] reasonably likely to elicit an incriminating response," *Rhode Island v. Innis* (1980) 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297, especially when we focus "primarily upon the perceptions of the [defendant], rather than the intent of the police." *Ibid.*

As defendant was subjected to custodial interrogation without the benefit of his *Miranda* rights, we conclude that his responses to the question "Whose are these?" must be suppressed. *Oregon v. Elstad* (1985) — U.S. —, 105 S.Ct. 1285, 84 L.Ed.2d 222.

**The Arrest and Post-Arrest Statements**

Morales was not the tenant or owner of the apartment under search. Probable cause to arrest him therefore did not arise from the officers' discovery of drugs in the bedroom, *compare Summers, supra* (presence of drugs in house creates probable cause to arrest house owner), but from defendant's admission that the three glassines were his. *See Rawlings v. Kentucky* (1980) 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (once petitioner admitted ownership of drugs in co-defendant's purse, police had probable cause to arrest him).

■ This admission was taken in violation of defendant's *Miranda* rights, however, and we are guided by this Circuit's opinion in *United States v. Marchand* (2d Cir.1977) 564 F.2d 983, *cert. denied* (1978) 434 U.S. 1015, 98 S.Ct. 732, 54 L.Ed.2d 760, to find that such illegality rendered his consequent arrest invalid. In *Marchand,* Judge Friendly described defendant's contention that "the arrest was illegal since it was based on [evidence obtained] in the course of an unlawful search ...," *id.* at 991, and stated that

[i]f the arrest stemmed solely from the discovery of Marchand's name [from an illegal search], we would be constrained to agree ...".

*Ibid.* Finding that a properly obtained basis for probable cause otherwise existed, however, the Court declined to invalidate the arrest. Here, probable cause for Morales' arrest derived entirely from his unwarned admission. As there was no other basis on which to find probable cause, the arrest must be declared illegal. *See United States v. Taheri* (9th Cir.1981) 648 F.2d 598, 601 (where only basis for arrest was illegally seized evidence, the court, citing *Marchand, supra,* held that "the arrest is also illegal since it was not supported by any independent factual basis providing probable cause at the time it was made").

■ Defendant's post-arrest surrender of seven heroin glassines from his waistband and his explanation as to why he had not "dumped" them were made in response to the officers' threat that he would be strip-searched, which threat was validly made only as incident to defendant's arrest. Similarly, but for the arrest he would not have been in a police station to make the statement to Officer Bradley, or any other police officer. His surrender of the drugs and statements thereafter must be suppressed as fruits of his unlawful arrest. *Wong Sun v. United States* (1963) 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441.

Defendant's motion to suppress his pre-arrest statement, post-arrest statements, and the seven glassine bags of heroin recovered from his person is granted.

SO ORDERED.